# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs November 1, 2016

## IN RE KAYLA B., ET AL.

**Appeal from the Juvenile Court for Cumberland County**
**No. 2015-JV-5238   Larry Michael Warner, Judge**

_____

**No. E2016-01192-COA-R3-PT-FILED-FEBRUARY 1, 2017**

_____

This appeal involves the termination of a mother's parental rights to six children and a father's parental rights to three of those children.  The juvenile court found clear and convincing evidence of five grounds for termination of parental rights and that termination of parental rights was in the children's best interest.  We conclude that DCS did not prove abandonment by an incarcerated parent by clear and convincing evidence. Because the record contains clear and convincing evidence to support four grounds for termination, namely, abandonment by failure to provide a suitable home, substantial noncompliance with the requirements of the permanency plan, persistence of conditions, and severe child abuse, and that termination is in the best interest of the children, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and BRANDON O. GIBSON, JJ., joined.

Cynthia Fields Davis, Crossville, Tennessee, for the appellant, Brandie V.

Jeffrey A. Vires, Crossville, Tennessee, for the appellant, Allen S.

Herbert H. Slatery III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Brandie V. ("Mother") is the mother of six children, Kayla, Jaden, Ashton, Isabella, Jace, and Korie. The children range in age from three to twelve. Allen S. ("Father") is the father of the three youngest children, Isabella, Jace, and Korie. On February 11, 2015, acting on a report of environmental neglect, the Tennessee Department of Children's Services ("DCS") sent a case manager to Mother and Father's home to investigate.

The investigation revealed a home unfit for human habitation. The case manager observed piles of trash, empty propane cans, and broken glass in the yard. The contents from a malfunctioning toilet flowed directly into the yard. The front door of the home was broken, allowing cold air to enter. The floor directly inside the home's entrance was badly deteriorated, and a large hole had formed.

The interior of the home was also dirty and unsafe, filled with used batteries, dirty dishes and clothes, trash, and more empty propane cans. Dirty diapers were scattered throughout the home. The home lacked running water and electricity, and a propane heater was being used near flammable objects. Tobacco products were in easy reach of the children.

Unsurprisingly, the state of the children reflected the home. The children appeared dirty.

The case manager administered drug screens to the parents. Mother's test showed negative, but Father's test showed positive for methadone.

The case manager informed the parents that the home was unsafe. Mother and Father agreed to move the children to a hotel temporarily so that they could eliminate the safety hazards. The next day, however, after discovering that the parents and the children had remained in the home, DCS filed an emergency petition seeking temporary protective custody of the children.

The Juvenile Court for Cumberland County, Tennessee, entered a protective custody order granting temporary legal custody of the children to DCS on February 12, 2015. After a preliminary hearing, the court found probable cause to believe that the children were dependent and neglected. At the adjudicatory hearing on April 24, 2015, Mother and Father stipulated that the children were dependent and neglected and further stipulated to the facts alleged in DCS's emergency petition. Consequently, the court

2

found that DCS had proven by clear and convincing evidence that the children were dependent and neglected.

On October 5, 2015, DCS filed a petition to terminate the parental rights of both Mother and Father.[1]  The petition alleged abandonment by failure to establish a suitable home, abandonment by an incarcerated parent, substantial noncompliance with the requirements of the permanency plans, severe child abuse, and persistent conditions that prevented the children from being returned to the parents' custody.  On February 17, 2016, the court held a hearing on DCS's petition to terminate parental rights.

A.  PROOF AT THE HEARING

1.  The 2012 Dependency and Neglect Case

This was not DCS's first encounter with this family.  On March 30, 2012, DCS received a report of prenatal drug exposure when Mother gave birth to twins, Jace and Korie.  Upon admission to the hospital, Mother tested positive for benzodiazepines, opiates, and THC.[2]  At birth, Jace tested positive for opiates, and Korie tested positive for opiates and benzodiazepines.  The family was living in a hotel, having recently been evicted for not paying rent.  The children were placed in the protective custody of DCS on April 1, 2012.  On September 24, 2012, the Juvenile Court for Cumberland County, Tennessee, adjudicated all six children dependent and neglected and further found that Jace and Korie were the victims of severe child abuse perpetrated by Mother and Father "due to mother's pre-natal drug use and the father's knowledge of that pre-natal drug use and failing to stop or attempt to stop the pre-natal drug abuse."

Both parents cooperated fully with DCS and freely admitted their struggles with substance abuse.  The parents obtained alcohol and drug assessments and followed the recommendations for inpatient substance abuse treatment.  During the course of treatment, Mother learned that she was a "binge user," in that she was able to maintain sobriety for a period of time and then would relapse after a triggering event.  Father obtained a psychological evaluation and received appropriate mental health treatment.

By June 24, 2013, the parents had obtained new housing and addressed their substance abuse and mental health issues.  After approving the condition of the new

---

[1] DCS also sought to terminate the parental rights of David B., the father of the three older children.  The juvenile court ruled that DCS had proven, by clear and convincing evidence, both grounds to terminate David B.'s parental rights and that termination was in the best interests of the children.  David B. has not appealed the juvenile court's order.

[2] THC, or tetrahydrocannabinol, "is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

home, DCS allowed the three oldest children to return to the parents for a trial home visit. In August, however, Mother suffered a relapse, which necessitated additional treatment and supervision and slowed the return of the remaining children.

On February 8, 2014, because the parents had fulfilled their responsibilities in the permanency plan, the court returned custody of all six children to the parents. Unfortunately, one year later, the juvenile court again removed the children from their parents' custody based on the deplorable condition of the home and concerns about the parents' drug use.

2. The 2015 Dependency and Neglect Case

DCS, with the participation of the parents, developed a new permanency plan on March 2, 2015, with the twin goals of return to parent and adoption. The 2015 plan identified four areas of concern and directed the parents to take specific actions to meet those concerns. First, because of the parents' history of drug abuse, the plan required the parents to submit to an alcohol and drug assessment and follow all recommendations, refrain from associating with drug abusers, and submit to random drug screens. Second, to ensure a safe and suitable home for the children, the plan directed the parents to obtain a legal means of support, develop a budget, obtain appropriate housing, demonstrate the ability to maintain a safe and clean home, and allow monthly home visits. Third, because Mother and Father had disclosed potential mental health issues, the plan required the parents to obtain psychological evaluations and follow all recommendations. Finally, Mother and Father were directed to pay child support, visit their children, and complete parenting classes after the other plan requirements were met because of their pattern of poor parenting skills.

After explaining the plan requirements and the criteria for termination of parental rights to the parents, the case manager attempted to help them fulfill their responsibilities. She set up phone calls and visitation with the children. She showed them the hazardous conditions in the home that needed to be remedied. She provided information for the parents to schedule alcohol and drug assessments and psychological evaluations. She also discussed applying for public housing and developing a budget. She provided both gas cards and actual transportation. She administered numerous random drug screens and supervised visitation with the children. As the case progressed, she reminded the parents of their responsibilities and offered continued assistance.

Between February and July, however, the parents made little progress. They did not remedy the safety concerns in the home, obtain appropriate alcohol and drug assessments,[3] or complete psychological evaluations. Father failed drug screens in

---

[3] Although Mother obtained an alcohol and drug assessment, the case manager required her to obtain a second assessment that met the plan requirements. The plan directed the parents to be "open and

March and April. Mother also failed her April drug screen, was arrested for shoplifting, and spent nine days in jail.

Mother was incarcerated a second time on May 16, and remained in jail until mid-October. Father was incarcerated for probation violations for ten days in May and from June 19 until July 22. By July, neither parent had paid any child support, and Father pled guilty to three counts of criminal contempt for his failure to pay.

The court held a review hearing on July 24, 2015, making the obstacles to reunification apparent. The parents stipulated that:

> [Mother] is presently incarcerated. [Father] was recently incarcerated on a [probation violation]. [Father] failed his hair follicle this month for methamphetamine, oxycodone, and THC. [Mother] was clean on her most recent hair follicle, but she has been incarcerated since May and admitted to using suboxone and THC prior to her incarceration. Their home currently has no water or electricity, and the outside of the home has not been cleaned.

Both parents failed the drug screens administered on the day of the hearing.[4] In late July, the parents' home and all its contents were destroyed in a fire. Fortunately, neither parent lived in the home at the time.

After the July hearing, Father found employment with an excavation company and subsequently made three child support payments: $30 in August, $45 in September, and $15 in November. He failed another drug screen in August, but he passed his drug screen in November. The case manager testified that Father had been unavailable for drug screens since November. By February 2016, Father had not obtained an alcohol and drug assessment or received any treatment for substance abuse.

Mother completed a substance abuse program while in jail and passed a drug screen when she was released in mid-October. She also submitted to a second alcohol and drug assessment but never obtained the results or learned the recommendations. In December, Mother tested positive for oxycodone without a prescription. She completed a psychological evaluation in January, which indicated that she was at high risk for a relapse. Mother never obtained steady employment; she worked for a short time for "the

---

honest in communication" with the alcohol and drug assessment provider "to ensure appropriate treatment is provided." The case manager determined that Mother's first assessment did not meet this requirement because she failed the random drug screen administered immediately following the assessment.

[4] Because of the parents' legal issues and failed drug screens, DCS developed a revised permanency plan in August that incorporated the requirements of the initial plan and included new requirements to refrain from illegal activities and attend Narcotics Anonymous meetings.

Villa" and cleaned a few houses.

Mother and Father moved into a new rental home in January 2016. Both parents claimed that their new home would be safe and appropriate for the children. The case manager, however, testified that, although she had attempted one or two random home visits, the parents were never home when she arrived. Consequently, she could not verify the home's appropriateness.

3. Testimony of the Parents and Foster Parent

Mother testified that she had overcome her substance abuse problem. She started attending Alcoholics Anonymous ("AA") meetings after her release from jail and maintained she was feeling "the strongest I've ever felt." According to Mother, she passed all the drug screens administered by her probation officer, and her failed December drug screen was an aberration caused by an injection she had received for back pain. Mother explained that she had not obtained the results of her alcohol and drug assessment because she did not have $25.[5] Mother was not concerned about her current lack of substance abuse treatment because "this has worked so far."

Father claimed that he had complied with the requirements of the plan. He received weekly therapy for his mental health issues and was taking his medications as directed. He had seen a provider about an alcohol and drug assessment, scheduled a psychological evaluation for the month after the hearing, and was attending AA meetings. He admitted, however, that he did not have a sponsor and did not participate in the meetings. He stated: "To tell you the truth I sit back real quiet and don't talk unless they ask me something. I don't really . . . to tell you the truth I would rather be at work."

Both parents consistently visited the children and brought food and gifts to each visit. Although Mother claimed the visits went well, the foster mother described the visits as "wild." The parents agreed that the children have become less openly affectionate as this case has continued. Mother also conceded that only Ashton and Isabella still hug her at visitations. Kayla had become "kind of standoffish," and Jaden followed her lead. Mother admitted that Kayla's attitude has been affected by the amount of time she has spent in foster care. Father confirmed that only the younger children hug them now.

DCS placed all six children in the same foster home. When the children entered foster care, Jace was three years old, in diapers, and unable to walk. Korie, also age three, was unresponsive to physical affection. Isabella was four, in diapers, and in need

---

[5] Because Mother failed to call or appear when her assessment was initially scheduled, the provider required her to pay a $25 fee before releasing her assessment results.

6

of speech therapy. Jace, Isabella, and six-year-old Ashton all needed extensive dental work to remedy damage caused by tooth decay.[6]

Foster mom testified that all six children were thriving in her home. Jace was walking; Korie was affectionate; and all the children, except Jace, were out of diapers. The younger children participated in the Head Start program, and the older ones performed well in school. Jaden's progress in school had improved with tutoring. Kayla had some counseling initially, which had since been discontinued. Isabella's speech had vastly improved with speech therapy. Ashton, however, had developed some behavioral issues, such as temper tantrums, and was receiving counseling at school. Foster mom expressed her desire to adopt all six children.

## B. THE JUVENILE COURT'S FINAL DECREE OF GUARDIANSHIP

On June 2, 2016, the juvenile court issued its final decree terminating the parental rights of Mother and Father. The court found that DCS met its burden of proving, by clear and convincing evidence, all five grounds for termination of the parental rights of both parents. After considering the statutory best interest factors, the court further found that it was in the children's best interest to terminate parental rights.

## II. ANALYSIS

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995). However, parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2016).

Tennessee Code Annotated § 36-1-113 sets forth the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, they must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

---

[6] Both times Isabella entered foster care she had numerous teeth removed due to extensive tooth decay.

7

Because of the constitutional dimension of the rights at stake in a termination proceeding, the parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d at 596. "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). Additionally, as this Court has recently explained, "[w]hen the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Thus, this Court gives great weight to the credibility accorded to a particular witness by the trial court. *Id.* (citing *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)).

In appeals of termination proceedings, we make our own "determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007). We "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016), *cert. denied sub. nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016).

On appeal, Mother and Father argue that DCS did not present clear and convincing evidence that their parental rights should be terminated or that termination is in the best interest of the children. We begin our review with the grounds found by the juvenile court for termination of parental rights.

8

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). The juvenile court concluded that Mother and Father abandoned their children under both the second and the fourth definition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii), (iv) (2014).

a. Failure to Provide a Suitable Home

A child has been abandoned under the second statutory definition if the child has been removed from the home of a parent as a result of a finding that the child was dependent and neglected, and "for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable effort[ ] to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id.*

A "suitable home" means more than adequate "physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). "[A] home may be rendered unsafe and unsuitable by the conduct of its occupants." *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011). Thus, a parent's compliance with the statement of responsibilities in the permanency plan is "directly related to the establishment and maintenance of a suitable home." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). In reviewing this ground for termination, we consider the actions of DCS, Mother, and Father from February 13, 2015, to June 12, 2015.

Between February and June, the case manager met with the parents, provided them with information to schedule the necessary assessments, and showed them the hazards in the home that needed to be remedied. She offered help with transportation, developing a budget, and applying for new housing. In contrast to the case manager's efforts, the parents made little or no attempt to provide their children with a suitable home during this time frame. Both parents continued to struggle with substance abuse and ran afoul of the law as well. Father tested positive for drugs in two out of three random drug screens. Mother tested positive for THC, was arrested for shoplifting, and spent nine days in jail. Father violated his probation and was incarcerated for ten days. In spite of Mother's

testimony to the contrary, the home remained unlivable.[7] Mother and Father made no reasonable effort to provide a suitable home during the relevant time period.

Beyond reasonable efforts by DCS and a lack of reasonable effort by the parents, DCS must also show the parents demonstrated a lack of concern for their children such that it appears unlikely they will be able to provide a suitable home at an early date. Tenn. Code Ann. § 36-1-102(1)(A)(ii). In evaluating the evidence on this ground, we may consider the parents' more recent behavior. *In re Joshua S.*, 2011 WL 2464720, at *18. Even though the parents moved into a new home and made some recent progress on meeting their responsibilities, the evidence supports the juvenile court's finding that the parents were unlikely to provide a suitable home at an early date. Father had yet to obtain the required assessments or address his substance abuse problem. The results of Mother's alcohol and drug assessment were still unknown, and Mother had not shown success at remaining drug free while living with Father. After reviewing this record, the juvenile court properly concluded that DCS met its burden of establishing this ground for termination by clear and convincing evidence.

b. Abandonment by Incarcerated Parent

The fourth definition of "abandonment" applies in cases in which the parent is incarcerated or had been incarcerated within the four-month period preceding the filing of the petition to terminate and "contains two distinct tests for abandonment." *In re Audrey S.*, 182 S.W.3d at 865. One test examines pre-incarceration visitation and support, and the other examines the pre-incarceration conduct of the parent. The incarcerated or formerly incarcerated parent is deemed to have abandoned a child if he or she:

> either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The juvenile court found that Mother and Father had both willfully failed to support their children.

---

[7] Mother's testimony that she cleaned the home and, within two months, it was in good condition was directly contradicted by the case manager. The juvenile court found the case manager's testimony to be credible, and we accord great weight to the lower court's credibility findings. *Walton*, 950 S.W.2d at 959. Mother's story is also belied by the parents' stipulation in July that the home still lacked electricity and water and the trash had not been removed.

It is undisputed that Mother and Father were incarcerated for all or part of the four months preceding the filing of the petition to terminate and did not pay child support during the relevant time period. Both parents, however, argue that their failure to pay was not willful. The financial ability, or capacity, of a parent to pay child support must be considered in determining willfulness. A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination, the court must review a parent's means, which includes both income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013).

We find no evidence in this record of either parent's income or available resources during the four months immediately preceding their incarcerations. Both parents were unemployed when the children entered foster care. Father did not begin working until July or August of 2015, after he was released from jail. Although Mother testified that she worked for eight weeks at "the Villa," she was never asked about her income during the four-month period.

We conclude that the evidence was less than clear and convincing that Mother and Father willfully failed to support their children. Without at least some testimony concerning the parents' income during the four months preceding their incarcerations, there was no basis to find that the parents' failure to pay child support was willful. *See In re Lynx C.*, No. E2016-01568-COA-R3-PT, 2016 WL 7378801, at *5 (Tenn. Ct. App. Dec. 20, 2016). Thus, DCS failed to carry its burden of establishing failure to support as a ground for termination.

2. Substantial Noncompliance with the Requirements of the Permanency Plan

The juvenile court also found Mother and Father failed to substantially comply with their responsibilities in the permanency plans. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014)). If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. The unsatisfied requirements must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

DCS removed the children because of the deplorable condition of their home and concerns about the parents' drug use. The permanency plan required the parents to: (1) submit to both an alcohol and drug assessment and a psychological evaluation and follow

11

all recommendations; (2) refrain from associating with known drug abusers; (3) submit to random drug screens; (4) obtain a legal means of support; (5) develop a budget; (6) obtain appropriate housing; (7) allow monthly home visits; (8) pay child support; (9) visit their children; and (10) attend parenting classes after the other responsibilities had been met. We agree with the juvenile court that the plan requirements were reasonable and related to the conditions which necessitated the removal of the children.

Next, we must determine whether each parent's noncompliance is substantial in light of the importance of the requirements to the overall plan. *In re Valentine*, 79 S.W.3d at 548-49. Our focus is on the parents' efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). "[A] permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives." *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). "[P]arents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis." *Id.*

Here, Father's efforts to meet his responsibilities under the plan were too little, too late.[8] *See In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003). He found a job but never developed a budget or made more than token child support payments. He never remedied the hazards in his previous home, and DCS was unable to verify that his new home was safe and appropriate. He never obtained an alcohol and drug assessment or a psychological evaluation. He failed multiple drug screens and was unavailable for additional screens since November. While he started attending AA meetings in October, he was not really following the program. He had no sponsor and refused to participate in the meetings.

By contrast, Mother completed a substance abuse program in jail and, after her release, submitted to both an alcohol and drug assessment and a psychological evaluation. She testified that she attended AA meetings, had a sponsor, and was diligently searching for employment. She had moved into a new home with Father that she claimed was appropriate for the children. While "[a]n incarcerated parent is not absolved of his or her parental responsibilities while in jail or prison[,] . . . incarceration is a relevant

---

[8] Father argues that he is being penalized because he is poor. *See In re DMD*, No. W2003-00987-COA-R3-PT, 2004 WL 1359046, at *5 (Tenn. Ct. App. June 17, 2004) (agreeing that "mere poverty is not grounds for termination of parental rights"). Father's failure to substantially comply with his responsibilities in the permanency plan is a result of his own lack of effort, not a lack of income. Father was given the means to schedule a free alcohol and drug assessment and psychological evaluation, which he failed to do in a timely manner. He also refused the case manager's offer to help him apply for suitable housing and work on completing his responsibilities under the plan, choosing instead to go his own way.

consideration when judging that parent's ability to fulfill his or her responsibilities to the child." *In re Jonathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at *13 (Tenn. Ct. App. Feb. 20, 2015).

Although we credit Mother for her efforts, Mother failed to comply with the reasonable responsibilities contained in the permanency plan. The proof showed that Mother was a "binge user" who often had periods of sobriety followed by a relapse into addiction. She failed her most recent drug screen in December, and her psychological evaluation the following January revealed that she remained at high risk for a relapse. She never obtained the results of her most recent alcohol and drug assessment and thus, never followed the recommendations. She admitted at the hearing that living with a known drug abuser is a common trigger for a relapse, and yet she continued to live with Father, who had yet to address his substance abuse issues. Accordingly, we conclude that DCS met its burden of proving that both parents' parental rights should be terminated on this ground as well.

## 3. Persistence of Conditions

The juvenile court also found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). The question before the court, therefore, is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

This ground authorizes termination of parental rights when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely

13

returned to the parent . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 549.

We conclude that DCS met its burden of proving all three elements of this ground for termination. DCS removed the children from the parents' home one year before the hearing based on environmental neglect and concerns about the parents' drug use. At the time of the hearing, conditions continued to exist that prevented the children's safe return to their parents. Neither parent had sufficiently addressed their substance abuse issues. Father failed multiple drug screens and yet did not obtain an alcohol and drug assessment or receive any drug treatment. Mother, who continued to live with Father, acknowledged she was a binge user subject to frequent relapses. She also failed her most recent drug screen. Alarmingly, she maintained that she did not need any additional substance abuse treatment even though she acknowledged "bad decisions here and there."

On these facts, there is little likelihood that the conditions that prevent the children's safe return will be remedied at an early date. As noted above, this was not the first instance in which DCS had been involved with these parents. In the previous instance, the children spent almost two years in foster care because of the parents' drug use. After an extended trial home visit, the children were returned to their parents' custody, and yet, one year later, DCS removed the children again for similar issues. While they may love their children, Mother and Father had not sufficiently addressed their substance abuse issues.

Continuation of the children's relationship with Mother and Father will greatly diminish their chances of an early integration into a safe and stable home. These children had spent three of the previous four years in foster care. Currently, all six children are together in one foster home. They are thriving, and the foster family wishes to adopt them.

4. Severe Child Abuse

The juvenile court also held that the parents' rights should be terminated based on a previous finding that they had committed severe child abuse against the two youngest children, Jace and Korie. A parent's rights may be terminated if

[t]he parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to

14

terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

Tenn. Code Ann. § 36-1-113(g)(4).  Under this ground for termination of parental rights, a finding of severe abuse against one child can be the basis for terminating parental rights to a sibling, including a half-sibling. *See In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *12 (Tenn. Ct. App. Sept. 22, 2016), *perm. app. denied*, (Dec. 16, 2016).

On September 24, 2012, the juvenile court found that Jace and Korie were the victims of severe child abuse due to Mother's prenatal drug use and Father's knowledge of that drug use and failure to intervene.  The finding of severe child abuse is res judicata in this proceeding.  *See In re Heaven L.F.*, 311 S.W.3d 435, 439-40 (Tenn. Ct. App. 2010) ("Therefore, the issue of whether Mother committed severe child abuse is *res judicata* and the trial court properly found by clear and convincing evidence that Mother's parental rights should be terminated.").  As such, we conclude that clear and convincing evidence supported the juvenile court's determination that Mother's and Father's parental rights to Jace and Korie and to their siblings and half-siblings should be terminated for severe child abuse.

## B.  BEST INTEREST OF THE CHILDREN

As DCS proved multiple grounds for termination of parental rights, we now turn to the issue of whether termination is in the best interests of the children.  Because "[n]ot all parental misconduct is irredeemable, . . . Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005).  Tennessee Code Annotated § 36-1-113(i)[9] lists nine factors that courts may

---

[9]The court must consider the following, non-exclusive factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

15

consider in making a best interest analysis. The focus of this analysis is on what is best for the child, not what is best for the parent. *Id.* at 499. At the same time, "the inquiry should address itself to the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

The juvenile court found multiple best interest factors weighed against the parents. The court focused on the parents' behavior during the pendency of this case including their continued drug use and failure to pay child support. The court determined that Mother and Father had failed to make a lasting adjustment in their lives and, even after reasonable efforts by DCS, a lasting adjustment was not reasonably possible in the near future. Neither parent had addressed the underlying substance abuse issues that sent their children into foster care. Without a concerted effort to address these issues, it was highly unlikely that the parents could ever provide a safe home for these children.

The juvenile court also relied on the children's relationship with the foster family and the detrimental effect a change in caregivers would have on the children. The court noted that the children had established a strong bond with the foster family, and the family wished to adopt them. The court also determined that the children needed to be

---

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Westlaw through March 22, 2016).

released from the stigma of being foster children. The record in this case supports these findings.

Jace and Korie spent the first two years of their lives in foster care because of prenatal drug exposure. The evidence suggests that the twins did not receive proper care during the year they were in their parents' custody. At age three, Jace was unable to crawl or walk and needed extensive dental care. Shortly after entering foster care, he began to walk and appeared to "be making up for lost time." Korie was withdrawn and unresponsive. In foster care, she was happy and affectionate. Isabella was four, still in diapers, and unable to communicate. In foster care, she successfully moved out of diapers and was benefiting from extensive speech therapy. Kayla was twelve when she entered foster care for the second time. She no longer needed counseling and was thriving in school. Jaden's school performance was improving with tutoring. Ashton, who was six when he was removed from his parents, had some behavioral issues and was receiving counseling.

All six children were thriving in their foster home and had bonded with the foster family. On the other hand, the extended time the children had spent in foster care had clearly impacted the children's relationship with their parents. Although the parents consistently visited their children, Kayla, Ashton, and Jaden had become more withdrawn and less affectionate over the past year. Kayla, in particular, had been adversely affected by her extended time in foster care.

Clear and convincing evidence supported the juvenile court's finding that termination was in the children's best interest. With termination, the children can receive proper care and financial support. They also have the opportunity for a stable life.

### III. CONCLUSION

We conclude that DCS did not prove by clear and convincing evidence that parental rights should be terminated on the ground of abandonment by incarcerated parent. Nevertheless, we conclude that four other grounds for termination were proven by clear and convincing evidence. We also conclude that the juvenile court's best interest determination was supported by clear and convincing evidence. Accordingly, we affirm the juvenile court's decision to terminate parental rights.

_____
W. NEAL MCBRAYER, JUDGE